IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DOROTHY E. DANIELS              :         CIVIL ACTION
                               :
          v.                    :
                               :
THE SCHOOL DISTRICT OF          :
PHILADELPHIA, et al.            :         NO. 12-2806

MEMORANDUM

Bartle, J.                                      November 7, 2013

          Plaintiff Dorothy E. Daniels ("Daniels") brings this
employment discrimination action against the School District of
Philadelphia (the "School District") and individual defendants
Leslie Mason ("Mason"), Kenneth Christy ("Christy"), Rachel
Marianno ("Marianno"), and Katherine Pendino ("Pendino").
Daniels alleges violations of her civil rights under:  (1) Title
VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.; (2) 42
U.S.C. §§ 1981 and 1983; (3) the Age Discrimination in Employment
Act ("ADEA"), 29 U.S.C. § 621 et seq.; and (4) the Pennsylvania
Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 951 et
seq.  Daniels, a school teacher, asserts not only race and age
discrimination by the defendants but also retaliation when she
complained about it.  She further avers that this conduct
violated her constitutional rights to free speech and equal
protection.[1]

_____

1.  We granted the motion of the individual defendants Mason,
                                              (continued...)

Before the court is the defendants' motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

I.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or ... showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).

A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable jury to find for the plaintiffs.  Id. at 252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

_____

1.(...continued)
Marianno, Christy, and Pendino to dismiss Daniels' claims of age discrimination and age-based retaliation under the ADEA in an August 28, 2012 Order (Doc. #10).

must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. We view the facts and draw all inferences in favor of the non-moving party. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). When ruling on a motion for summary judgment, we may only rely on admissible evidence. See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).

## II.

The following facts are undisputed or viewed in the light most favorable to Daniels as the nonmoving party. Daniels is an African-American woman who was born on January 2, 1950. She has a bachelor's degree in business administration, a master's degree in elementary education, and the necessary certification to teach Middle Years English, Reading, Literature, Language Arts, Writing, and Speaking.[2] The School District hired Daniels on a permanent, full-time basis in August 2008 to teach Middle Years English. She taught at the Bregy Middle School ("Bregy") during the 2008-2009 school year. While she had some disputes with her superiors at Bregy, she improved her students' standardized testing scores. Daniels was complimented for this achievement by her peers and supervisors and received satisfactory ratings in her performance reviews that year. She was subjected to a forced transfer from Bregy at the end of the school year in June 2009.

---

2. "Middle Years" corresponds with the seventh and eighth grade levels.

A "forced transfer" means a teacher's transfer away from a school because his or her position has been eliminated as a result of a budget shortfall or another allocation-related reason.[3]  For each school year, School District principals set their individual school's budget, including the number of teaching positions at each grade level and the subject-matter certifications required for those positions.  The School District's central office reviews the budgets, approves them, and then uses a series of criteria to assign or transfer teachers to match the principals' needs.  When a principal eliminates a position or changes the certification requirements as part of the yearly budget process, he or she does not have the authority to determine which faculty members will be subject to a forced transfer.  Once a teacher is "forced transferred," he or she is given the opportunity in a "site selection process" to choose a new school based on the availability of a position that meets the teacher's qualifications, seniority, and other factors.

Following her forced transfer from Bregy, Daniels selected a Middle Years English and Reading position at the Thomas Mifflin School ("Mifflin") for the 2009-2010 school year.  Leslie Mason, a Caucasian female, was in her first year as Mifflin's principal.  Complaints by Daniels of illegal conduct begin with her time at Mifflin.

---

3.  A forced transfer is distinct from an "administrative transfer with prejudice," which is disciplinary in nature.

On Parent's Night, September 9, 2009, Daniels states that Mason explained to the group present that some of the Mifflin teachers were old enough to be "grandparents."  Daniels, the oldest teacher in the room, urges that Mason's words constituted ageism and were directed against her.  She made her feelings known to Mason at some point, but Mason took no action in response.  Months later, in March 2010, a colleague informed Daniels that "[t]hey call you Old School."  Daniels points to this as further evidence of age-based discrimination.

Daniels also highlights two race-related circumstances during her time at Mifflin.  First, at a teachers' meeting during the 2009-2010 school year, one teacher stated that the racial composition of the Mifflin staff did not reflect that of the student body, which is 90% African-American.  The teacher suggested that Mifflin hire more African-American staff to remedy this problem.  There is evidence that Mason replied that she was not required to hire minority teachers, although in her deposition Mason vigorously contests the circumstances of the conversation.[4]  It is not clear whether Daniels was present.  Second, Daniels without elaboration refers to a continuing Department of Justice investigation at Mifflin for failure to

_____

4.  Neither party has provided briefing on this point, but it appears as though individual principals in the School District have the ability to make certain hiring decisions on their own. This is distinct from staffing decisions that are made in order to conform the composition of a school's faculty to the principal's proposed budget for the coming year, which happens at the School District's central office without the principal's input.

follow undefined federal mandates regarding racial tension. With respect to this investigation, the U.S. Department of Education appears to be facilitating an "Early Complaint Resolution Agreement" between unnamed parties at Mifflin. There is no evidence that that agreement is related in any way to Daniels and her situation.

Daniels' tenure at Mifflin was marked by trouble in the classroom. Since Daniels was new there, School District policy required Mason to conduct a number of formal observations of Daniels' teaching throughout the year. In November 2009 and January 2010 observations, Mason found Daniels' performance to be below standard.[5] At the year-end evaluation, however, Mason rated Daniels as satisfactory overall.

In addition to formal observations, Christine Lokey visited Daniels' classroom at Mason's direction on several occasions throughout the year in order to provide Daniels teaching support. Lokey was a "literacy and math lead" at Mifflin in 2009-2010. In this position, she was expected to help Mifflin teachers with curriculum, teaching practices, classroom management, lesson planning, and professional development.

_____

5. The bases for these evaluations and the overall quality of Daniels' pedagogy are contested here and throughout the record. In short, Daniels considers herself to be a good teacher, but her superiors at each of the three schools at which she taught from 2009 to 2012 do not. With regard to 2009-2010 specifically, Daniels and Mason disagree over whether, for example, Daniels used the appropriate curriculum, whether Daniels' classroom met standards for appearance, and whether Daniels properly incorporated technology into her lesson plans.

Independent of Mason's direction, Lokey, who is an African-American female in her fifties, had also formed a judgment that Daniels was in need of assistance due to the unruly, disobedient behavior in Daniels' class that Lokey observed. For her part, Daniels did not request this support and states that Lokey's presence interfered with her teaching. It is contested whether Lokey's visits constituted "excessive monitoring" and whether Lokey was sent "to any Caucasian teacher's classroom to harass them."[6]

At the end of the 2009-2010 school year, Daniels was forced transferred away from Mifflin as a result of Mason's budget allocation for the coming fall. In preparing that budget, Mason made the determination that Mifflin would go "dual cert" in the Middle Years classes. Rather than using three teachers to teach the four Middle Years subjects, one of whom held a dual certification, Mifflin would instead rely on two dual-certified teachers to cover the same instructional ground. It is disputed whether the School District or Mason notified Daniels of the

6. Daniels further states in her affidavit that Lokey's observations constituted a violation of the collective bargaining agreement between the School District and the Philadelphia Federation of Teachers. There is evidence that at least one other teacher — the same one who took issue with the racial composition of the Mifflin staff — viewed Lokey's visits as violations of the collective bargaining agreement. However, the defendants explain, and Daniels does not contest, that Lokey's visits were informal and that no permanent evaluation or discipline could follow from them. They were not formal observations that under the collective bargaining agreement could only be performed by certain authorized supervisors.

impending dual certification requirement, but it is conceded that she did not obtain a second certification.

Her position at Mifflin was filled by Amanda Meiers. Meiers is a Caucasian woman, born in 1984. She was the Middle Years Science and Social Studies teacher at Mifflin in 2009-2010. While Mason claims that Meiers became triple-certified by obtaining a Middle Years English certification in the months before the coming 2010-2011 school year, Meiers' personnel file does not reflect this fact. Under the collective bargaining agreement ("CBA") between the School District and the teachers' union, the Philadelphia Federation of Teachers ("PFT"), teachers may be asked to teach one subject outside of their area of certification. No party has pointed us to a reason why teachers must be dual certified in order to avoid a forced transfer when they can stray from their subject-matter certifications in this manner.

The circumstances of Daniels' replacement at Mifflin are thus unclear. Daniels sent her first informal complaint to the School District concerning her experience at Mifflin on September 6, 2010. In addition to a series of disagreements that Daniels had with Mason concerning, for instance, Lokey's classroom visits and the handling of student discipline, this complaint took issue with Mason's "grandparents" comment and the revelation for a colleague that "[t]hey call you old school." Daniels explained that these circumstances constituted ageism and harassment. Daniels followed up by filing her first formal

-8-

Pennsylvania Human Relations Commission ("PHRC") complaint on October 28, 2010, in which she formally claimed that the treatment she received at Mifflin was age and race discrimination.

Daniels taught at the Edwin H. Vare Middle School ("Vare") during the 2010-2011 school year. It is disputed whether Daniels was given any notice of her forced transfer from Mifflin before September 2010, but it is not contested that Daniels did not fully participate in the 2010 site selection process.[7] The extent of her participation is unclear. Either the School District unilaterally assigned Daniels to Vare or she selected that school from a severely restricted set of options. Either way, Daniels "was the only teacher in her age group teaching at Vare." Rachel Marianno, an African-American female with twenty years' experience in the School District of Philadelphia, was Vare's principal that year. Marianno's assistant principal for the sixth grade was Kenneth Christy, a Caucasian male.

Daniels did not have a positive experience at Vare. At the outset, she did not report for the first three days of the school year because she claims that she was not aware of her forced transfer. Christy issued Daniels a disciplinary memo on

_____

7. It is not clear whether it was the School District's or Mason's responsibility to notify a teacher of a forced transfer. Mason claims to have had two face-to-face conversations with Daniels about the pending dual certification requirement and the possibility of a forced transfer during the spring and summer of 2010. Daniels denies that these conversations took place.

December 22, 2010 for this and other absences.  Marianno has conceded that Daniels' absences at the start of the school year should not have been counted if she did not know of her assignment to Vare.  In addition, in the first week or two of the school year, Daniels was not assigned a classroom.  She did not have keys to her classroom for weeks despite several requests.  She was required to "float" between classrooms, while the teachers in adjacent classrooms did not do so.  Furthermore, while at Vare, Daniels was asked to teach Social Studies, for which she was not certified.  It is contested whether Daniels in fact taught Social Studies at Vare as requested.

Daniels' students at Vare were, as a general rule, severely undisciplined.  She maintains that students with disciplinary problems were funneled into her class.  Daniels attempted to bring several instances of student misconduct to her supervisors' attention in October 2010, November 2010, February 2011, and March 2011.  They went unaddressed.  In one instance, she filed a police report when one student threatened physical violence against her.  Marianno and Christy took no action in response.

Daniels sent an informal complaint via email to Marianno, the principal, on February 2, 2011 in which she stated that the conduct of Marianno and Christy constituted harassment. In the email, Daniels noted her disagreement with Marianno on issues like inputting grades, access to classrooms, and being asked to do more than other teachers.  She accused Marianno of

changing her teaching assignment in order to justify a formal observation. However, Daniels did not mention any race- or age-related problems. Two days later, Marianno first formally observed Daniels' performance at Vare as unsatisfactory. Two more unsatisfactory observations followed, one of which was conducted by Christy, the assistant principal. All three observations reflected poor classroom management, tardiness, and a lack of preparation on Daniels' part. In her deposition, Marianno stated that "[Daniels'] instruction was extremely lacking, if not the worst I've seen in my 20 years with the district."

Shortly after the first formal observation, Daniels filed a second PHRC complaint on February 22, 2011, which alleged that the conduct of Marianno and Christy at Vare constituted retaliation that was related to the race and age discrimination at Mifflin of which Daniels had complained in her earlier October 2010 PHRC complaint. Daniels then went on sick leave starting March 12, 2011 due to anxiety and depression. She returned on April 18. During her absence, Marianno shouted at Daniels over the telephone concerning her students' grades. Ultimately, Daniels was rated as unsatisfactory for the 2010-2011 school year and was suspended by the School District for three days without pay. Daniels was again forced transferred when Vare became a charter school at the end of the 2010-2011 school year and all School District faculty and personnel were reassigned.

Daniels subsequently participated in the 2011 site selection process and chose to teach at the Penrose School ("Penrose") during the 2011-2012 school year as the Middle Years Literacy teacher. Katherine Pendino was the Penrose principal, a position she had held since 1998.[8] Beginning in mid-September and continuing through the fall of 2011, Pendino found Daniels' teaching to be below standard. The two women were at loggerheads throughout Daniels' abbreviated tenure at Penrose.

For example, on September 14, 2011, Pendino observed that Daniels' lesson plan was not effective, that she did not communicate expectations to students, and that her lessons were ineffectively delivered. As at Vare, Daniels referred Penrose students to Pendino for disciplinary problems, and Pendino in turn held Daniels responsible for the students' misbehavior. Daniels purportedly engaged in two "unsatisfactory incidents" when she sent a student to the faculty lounge and when she failed to prepare literacy plans in accordance with school policy. Following these incidents, Pendino issued Daniels a disciplinary memo and had a conference with Daniels and her union representative. Indeed, Pendino issued disciplinary memos to Daniels on a near-weekly basis from mid-September to mid-December 2011, a frequency which Daniels described as harassment that "border[ed on] terrorism—water boarding."

---

8. The parties do not make reference to Pendino's race or age.

Daniels vigorously disputes the assessments made in these memos. According to Daniels, Pendino held her accountable for tardiness after assuring her that she need not note her arrival time on a sign-in sheet. Daniels further states that she had timely submitted lesson plans and that Pendino made a number of comments disparaging Daniels' teaching in front of students. Pendino remarked that Daniels was "no good" and "want[ed] to get rid of her." Daniels was moved from Middle Years English to sixth grade English and Mathematics in October 2011, and her replacement was a "younger, Caucasian teacher." In a memo, Pendino wrote that a "Ms. Foy" would be teaching Middle Years English from then on as part of a larger rearrangement of teaching assignments, but there is no further evidence on Foy or this reassignment.

Daniels complained to school officials about Pendino. She wrote a December 7, 2011 letter to a School District administrator in which she detailed several instances of Pendino's conduct with which she took issue. She supplemented her February 2010 PHRC complaint against Marianno and Christy with a December 13, 2011 letter listing grievances against Pendino, among them complaints of ageism and racism. Finally, she filed a confidential Educator Misconduct Complaint with the Pennsylvania Department of Education on December 17, 2011. In

that complaint, she asserted that Pendino had recruited students to write surreptitiously what Daniels said to them.[9]

Importantly, however, at no point did Daniels complain directly to Pendino.  Indeed, when presented the opportunity to defend herself from further discipline with the assistance of a union representative, Daniels failed to appear at scheduled conferences with Pendino on at least three occasions.  In her brief, Daniels wonders what could explain "Pendino's sudden animosity towards [her]" so early in the school year, ultimately concluding that Pendino "ha[d] been enlisted by [School District] administrators to subject [Daniels] to retaliatory harassment and hostile work environment."  Nonetheless, other than this conjecture, there are no facts presented to suggest Pendino had any knowledge of Daniels' complaints against any defendant.  On or about December 15, 2011, citing repeated performance deficiencies, Pendino made a formal recommendation that Daniels be terminated.

That same month, Daniels requested "Family Medical Leave Absence" ("FMLA") until March 21, 2012 to address the anxiety and depression that she continued to suffer as a result of her work difficulties.  The School District, in denying the FMLA request, explained that Daniels had not worked the requisite

_____

9.  Pendino states in response that she asked the students to write what <u>any</u> adult said to them after she received reports from students and parents that Daniels had called a child "stupid" and told others to "shut the hell up."  Daniels strongly denies these allegations.

number of hours in order to be eligible.  Daniels does not

contest this finding.  A School District-employed physician, who

was not a psychiatrist or psychologist, examined Daniels in

January 2012 and found her fit to return to work.  Thereafter,

Daniels requested a third-party physician's evaluation through

her union, the PFT.  This physician's determination would be

binding under the CBA.

Carol Kenney, a School District administrator, then

asked the physician, Dr. Burton Weiss, to examine Daniels.

Daniels considers the opinion of Dr. Weiss to have been

improperly "influenced by Carol Kenney's desire to have [Daniels]

returned to work in February 2012 regardless of Plaintiff's

medical and mental conditions."  Daniels describes Dr. Weiss as

"[the School District]'s handpicked third-party physician" and a

"so-called[] independent" doctor.

There is evidence that Kenney had some knowledge of

Daniels' ongoing workplace complaints when she wrote her letter

to Dr. Weiss.  In her letter, Kenney simply explains exactly what

Daniels contends in this lawsuit:  she, Daniels, was out on sick

leave for treatment by a physician and therapist because her

principals failed to support her and harassed her.  The letter

reads in pertinent part:

> Please allow me to give you some background
> information.  Ms. Daniels was previously out
> on sick leave during the last school year
> from March 2011 until September 2011.  She
> stated that she was not supported by the
> principal at her last school and therefore
> transferred to a new school in September.

During the months of her absence, she was treated by both a physician and a therapist. She went out again on sick leave in December 2011 with the same complaints of being harassed by her new principal. She was seen by our school district physician and [ordered to return] to work on Feb 1, 2012. She did not report to duty.

Please opine on whether Ms. Daniels should have returned to work on February 1st. Our requests for third party evaluations are specific. Ms. Daniels was not denied additional treatment by her doctors, but was asked to return to work while treatment is ongoing.

There is nothing in this language beyond what Daniels herself contends was the cause of her sick leave.

Furthermore, while the School District selects the doctor from the pool of third-party physicians to evaluate an employee, the School District and the PFT paid the selected physician jointly and the PFT had the ability to have him or her removed from the pool should it have a reason to do so. The PFT took no such action in this case, and there is nothing in the record from which one could infer that Dr. Weiss had any knowledge of Daniels generally or her complaints specifically before Kenney reached out to him.

Dr. Weiss was asked to opine whether Daniels should have returned to work when ordered. He ultimately concluded in a February 15, 2012 opinion that Daniels' symptoms did not preclude her from working:

Ms. Daniels's symptoms of anxiety and depression arise from her dispute with the Principal and not from a definable psychiatric illness. Her problem is legal

> and administrative, not psychiatric....
> Psychiatric treatment and psychotropic
> medication is not able to change this
> situation and will not solve the source of
> Ms. Daniels's distress.... For this reason, I
> do not consider Ms. Daniels's absence from
> school to be due to a psychiatric disability.
> In my opinion, Ms. Daniels should have
> returned to work on February 1, 2012.

Because she was found to be able to return to work, Daniels was
denied wage continuation benefits.  She was given a mandatory
return date of February 27, 2012.  Her treating physician, Dr.
Fitzpatrick, recommended a return date of March 27, 2012.
Daniels did not come back to work in February, and Kenney
recommended that Daniels' employment be terminated.  The School
District initiated termination proceedings on May 2, 2012, and
Daniels filed this lawsuit twenty days later on May 22.[10]

### III.

Daniels' complaint contains nine counts.  We enumerate
them here in an attempt to bring some clarity to what is being
pleaded and what is being argued by the parties in favor of and
against the defendants' motion for summary judgment.  Count one
alleges race discrimination under Title VII against the School
District.  Count two pleads race discrimination under 42 U.S.C.
§ 1981 against all defendants, asserted through 42 U.S.C. § 1983.
In count three Daniels avers retaliation under Title VII against

---

10.  Neither party has directed us to anything in the record that
Daniels was terminated.  However, Daniels pleads in her complaint
that she was terminated "[o]n or about May 2, 2012."  The
defendants have not challenged the fact of Daniels' termination
in the briefing before us.

the School District, and, in count four, retaliation under § 1981 against all defendants. Count five asserts race and age discrimination under the PHRA against all defendants, while count six alleges retaliation against all defendants under the PHRA. Daniels sets forth in count seven age discrimination under the ADEA against all defendants. Count eight alleges retaliation under the ADEA against all defendants. Following our August 28, 2012 order, counts seven and eight are presently before us only as to the School District. Finally, count nine pleads violations of Daniels' rights to free speech and equal protection, brought under § 1983 against all defendants.

IV.

We turn first to the defendants' argument that they are entitled to summary judgment because there is no genuine dispute of material fact with respect to Daniels' claims under 42 U.S.C. §§ 1981 and 1983. We begin with § 1983, which creates a private cause of action to remedy deprivations of constitutional rights:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Public school districts are among the state actors that can be liable under § 1983. Mohammed v. School Dist. of Phila., 355 F. Supp. 2d 779, 782 (E.D. Pa. 2005). However, it

remains a necessary prerequisite to municipal liability under § 1983 that the offending personnel were operating under an official policy or practice. Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978); see also Hill v. Borough of Kutztown, 455 F.3d 225, 245 (3d Cir. 2006). The policy or practice must be the "moving force" behind the constitutional violation. Sanford v. Stiles, 456 F.3d 298, 314 (3d Cir. 2006). A failure to train, supervise, or discipline employees can constitute an official policy or practice when it rises to the level of "deliberate indifference" to known or obvious consequences. Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997). The plaintiff has a heavy burden, and a showing of "simple or even heightened negligence will not suffice." Bryan Cnty., 520 U.S. at 407.

There is simply no evidence in the record that an official School District policy or practice was the "moving force" behind any of the events complained of in this case. Similarly, the only evidence of a failure to train, supervise, or discipline is a statement from Kenney, the administrator at the School District's central office who referred Daniels' case to the third-party physician and ultimately recommended Daniels' termination, that she is unaware of any School District discrimination policies. Daniels makes no other reference to the record in support of her § 1983 or § 1981 claims. This "mere ... scintilla of evidence" is not enough to raise a genuine dispute of material fact, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986), and is certainly not sufficient to meet the heavy

"deliberate indifference" standard. <u>Bryan Cnty.</u>, 520 U.S. at 407. Summary judgment will be granted in favor of the School District on count nine of Daniels' complaint, which is her claim brought under § 1983, the First Amendment, and the Fourteenth Amendment.

As to the individual defendants, we are provided very little briefing from the defendants on § 1983 and none at all from Daniels. The defendants note that Daniels has not put forward evidence to support the elements of a First Amendment or Fourteenth Amendment violation on the part of any defendant. Daniels is silent on these arguments, and she does not defend her First and Fourteenth Amendment claims from summary judgment. We will therefore grant summary judgment in favor of all individual defendants on count nine.

We analyze Daniels' § 1981-based claims of race discrimination and race-related retaliation against the School District under the same rubric as that used for § 1983. Title 42 U.S.C. § 1981(a) gives "[a]ll persons within the jurisdiction of the United States ... the full and equal benefit of all laws" as that "enjoyed by white citizens," but it has no enforcement provision of its own. <u>McGovern v. City of Philadelphia</u>, 554 F.3d 114, 121 (3d Cir. 2009). Rather, "the express cause of action for damages created by § 1983 constitutes the exclusive remedy for violation of the rights guaranteed in § 1981 by state governmental units," and a failure to bring forward evidence of a policy, practice, or failure to train precludes a § 1981 claim

-20-

just as it does a § 1983 claim.  McGovern, 554 F.3d at 121.
Daniels has presented no evidence of a policy or practice on the
part of the School District endorsing race discrimination or a
failure on the part of the School District to train its employees
not to discriminate on the basis of race.  Her § 1981 claims
therefore fail against the School District.  Accordingly, summary
judgment will be granted in favor of the School District on
counts two and four of Daniels' complaint.

We will discuss plaintiff's § 1981 claims against the
individual defendants in conjunction with our discussion of her
race-related claims under Title VII and the PHRA since the legal
analysis is the same.

V.

To begin our analysis of Daniels' statutory claims of
race discrimination and retaliation under Title VII against the
School District, race discrimination and retaliation against the
individual defendants under § 1981, race and age discrimination
and retaliation under the PHRA against all defendants, and age
discrimination and retaliation under the ADEA against the School
District, we set forth the familiar burden-shifting framework
provided in McDonnell Douglas Corp. v. Green.  411 U.S. 792, 802
(1973).  McDonnell Douglas supplies the standard for claims under
§ 1981, Title VII, the PHRA, and the ADEA.  Pamintuan v.
Nanticoke Mem'l Hosp., 192 F.3d 378, 386 (3d Cir. 1999); Connors
v. Chrysler Fin. Corp., 160 F.3d 971, 973 (3d Cir. 1998); Jones
v. School Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1997).  The

plaintiff bears the initial burden of moving forward by making out a prima facie case, after which the defendant must come forward with evidence that there is a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. If the defendant succeeds in doing so, in order to survive summary judgment, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

VI.

In light of this burden-shifting framework, we address Daniels' race and age discrimination claims. We consider these claims together because the standards are nearly the same and the factual circumstances relevant to these claims are limited and intertwined. To make out a prima facie case of race discrimination, Daniels must come forward with evidence to establish the following four elements:

> (1) [s]he is a member of a protected class;
> (2) [s]he was qualified for the position
> [s]he sought to attain or retain;
> (3) [s]he suffered an adverse employment
> action; and
> (4) the action occurred under circumstances
> that could give rise to an inference of
> intentional discrimination.

Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).  A prima facie case of age discrimination requires the same showing save that the fourth element instead asks more specifically whether the plaintiff "was ultimately replaced, or the position was filled by, a younger person."  Connors, 160 F.3d at 974.

What constitutes an "adverse employment action" in the context of a discrimination case is not to be determined on a "one-size-fits-all basis."  Jones, 198 F.3d at 411.  Rather, "the elements of a prima facie case depend on the facts of the particular case."  Id.  A transfer can be an adverse employment action sufficient to satisfy the third element of a prima facie discrimination case when it is shown to be detrimental or undesirable in some objective way.  See id.  Ultimately, the circumstances must show that the action altered the "terms and conditions of employment."  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006).  As for the fourth element, a plaintiff may come forward with evidence of "circumstances that could give rise to an inference of intentional discrimination" by showing that, for example, similarly situated individuals outside of the protected class were treated differently.  Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 273 (3d Cir. 2010).

In the present matter, we initially note that the first two elements in Daniels' prima facie case are not disputed.  She is a member of a protected class as an African-American female and as a person over forty years of age, and she was qualified as a teacher according to School District standards.  As to the

third element, the defendants do not challenge that Daniels' 2010 forced transfer from Mifflin constitutes an adverse employment action. Daniels also maintains that the failure of the School District and Mason to notify her of her 2010 forced transfer until September 2010 such that she was denied full participation in the 2010 site selection process, as well as her discipline in December 2010, constitute adverse employment actions.

We note that there are genuine disputes of material fact as to whether it was Mason's responsibility to notify Daniels of the forced transfer and whether the responsible party did, in fact, fulfill the obligation to tell Daniels that she would need to choose a new school. Summary judgment will therefore be denied to the School District under counts one, five, and seven, Daniels' claims of race and age discrimination under Title VII, the PHRA, and the ADEA, and to Mason under counts two and five, which are Daniels' race discrimination claim under § 1981 and her race and age discrimination claim under the PHRA, to the extent those claims relate to Daniels' inability to participate fully in site selection as a result of the defendants' failure to notify her of her forced transfer.

Even so, as to the forced transfer itself, Daniels' race and age discrimination claims can only move forward against the School District. It is uncontested in the record that Mason had neither the power nor the opportunity to determine which faculty members would be forced transferred from Mifflin in the 2010-2011 school year as a result of her budget allocation.

There is no evidence from which a factfinder could reasonably infer that it was Mason's prerogative to make the actual staffing determination of which Daniels complains in this suit, and summary judgment will therefore be granted to Mason on counts two and five for the 2010 forced transfer itself.

We now determine whether there is evidence that the 2010 forced transfer occurred under circumstances that could give rise to an inference of intentional race or age discrimination. Daniels has come forward with such evidence. She was replaced at Mifflin by Meiers, who is both Caucasian and many years Daniels' junior. Daniels has therefore shown that a similarly situated peer outside her protected class replaced her. This gives rise to an inference of intentional discrimination. Anderson, 621 F.3d at 273; Connors, 160 F.3d at 974. Accordingly, Daniels has made out a prima facie case of race and age discrimination against the School District stemming from her forced transfer from Mifflin in 2010.

We now move to the next step in the McDonnell Douglas framework and assess whether the School District has put forth legitimate, non-discriminatory reasons for the forced transfer. We find that it has. Mason has explained that going "dual cert" in the Middle Years classes was fiscally responsible and that changing the number of Middle Years classrooms from three to two would reduce student movement and thus remove opportunities for misbehavior. After the budget was approved by the School District's central office, Daniels was transferred away from

Mifflin to meet that budget according to neutral criteria such as certification and seniority. These are legitimate, non-discriminatory reasons for the budget change and Daniels' subsequent forced transfer away from Mifflin.

The burden therefore shifts back to Daniels to show "some evidence" with respect to the forced transfer from Mifflin "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Daniels has satisfied this burden against the School District. As Daniels points out, Meiers, a younger, Caucasian teacher, took on Daniels' duties as Middle Years English teacher at Mifflin in 2010-2011. But while Daniels did not obtain a second certification in anticipation of Mifflin's 2010-2011 budgetary changes, Meiers' personnel file does not reflect that she held the certification necessary to take over Daniels' class either. Furthermore, the defendants highlight in their brief that teachers can be asked to teach one subject matter outside their area of certification. This evidence would allow a factfinder reasonably to disbelieve that the reason Daniels was forced transferred from Mifflin was her lack of a second certification to teach an additional class when a white teacher much younger than she lacked the qualifications necessary to take her place.

As such, the motion of the School District for summary judgment will be denied on Daniels' race and age discrimination claims under Title VII, the PHRA, and the ADEA to the extent they are predicated on her 2010 forced transfer, her subsequent replacement at Mifflin by Meiers, and the failure of the School District and Mason timely to notify Daniels of the forced transfer. Against Mason, only Daniels' claims of race discrimination under § 1981 and race and age discrimination under the PHRA that are based upon Mason's failure to notify Daniels of the forced transfer will survive summary judgment.

With regard to the 2010-2011 school year at Vare, Daniels argues only that her receipt of a disciplinary memo for being absent without leave in September 2010 is an adverse employment action. Daniels' disputed knowledge of the forced transfer from Mifflin, or lack thereof, has a material bearing on these events. Looking at the facts in the light most favorable to Daniels as the non-moving party, we will take it as true for present purposes that Daniels was not notified by the School District or Mason of her forced transfer.

The disciplinary memorandum is an adverse employment action. It constituted an official reprimand of Daniels for an absence from a position that she did not know she had. This altered the "terms and conditions of employment" sufficiently to satisfy the third prong of Daniels' prima facie case of race and age discrimination. See Burlington, 548 U.S. at 64.

However, the facts of the December 22, 2010 disciplinary memo do not give rise to an inference of race- or age-related discrimination with respect to any defendant. Daniels has not come forward with any evidence that her receipt of the memo constituted any treatment of her different from that of any other teacher under similar circumstances. Christy, the assistant principal at Vare who issued the memo, has explained that a disciplinary memo must be issued as a matter of School District policy when any teacher is absent without leave for three days. He received an automated payroll report from the School District's central office prompting him to do so. Marianno, Vare's principal during the 2010-2011 school year, has further stated that if Daniels did not know of her assignment, she should not have been marked AWOL. Even if what occurred was an embarrassing administrative error, it is not evidence from which an inference of discrimination can reasonably be made. Summary judgment will accordingly be granted to the School District on Daniels' race discrimination claims under Title VII and the PHRA and her age discrimination claims under the PHRA and ADEA with respect to the December 22, 2010 disciplinary memo. Likewise, we will grant summary judgment to Marianno and Christy on Daniels' race and age discrimination claims under the PHRA as they relate to the memo.

Because Daniels does not argue that any conduct during the 2011-2012 school year at Penrose is an adverse employment action, summary judgment will also be granted in favor of

Pendino, the principal of Penrose, as to all of Daniels' race and age discrimination claims under the PHRA.

In sum, Daniels' race discrimination and age discrimination claims under Title VII, the PHRA, and the ADEA, which are counts one, five, and seven of her complaint, survive summary judgment as to the School District concerning the failure to notify Daniels of the dual certification requirement at Mifflin and her 2010 forced transfer from that school. Counts two and five, which are Daniels' claims of race discrimination under § 1981 and race and age discrimination under the PHRA, survive against Mason based on the same failure of notification. Finally, counts one, five, and seven also survive as to the School District for Daniels' 2010 forced transfer from Mifflin and her replacement by Meiers at Mifflin. We will otherwise grant summary judgment against Daniels as to all other claims of race discrimination under § 1981 and Title VII, race and age discrimination under the PHRA, and age discrimination under the ADEA.

VII.

We now focus on Daniels' retaliation claims. To establish a <u>prima facie</u> case of retaliation under the <u>McDonnell Douglas</u> framework, a plaintiff must bring forward evidence:

> (1) that she engaged in protected activity,
> (2) that the employer took adverse action against her, and
> (3) that a causal link exists between the protected activity and the employer's adverse action.

Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997). The first element of a prima facie retaliation case is satisfied by a showing of "complaints to [the employer], whether oral or written, formal or informal." Abramson v. William Patterson Coll. of N.J., 260 F.3d 265, 288 (3d Cir. 2001). For an employee's complaint to be protected, he or she "must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (citing Clark County v. Breeden, 532 U.S. 268, 271 (2001)). Our court has applied this standard to § 1981, PHRA, and ADEA claims as well. Ventner v. Potter, 694 F. Supp. 2d 412 427 n.12 (E.D. Pa. 2010); Kerns v. Drexel Univ., Civil Action No. 06-5575, 2008 WL 2876590, at *18 (E.D. Pa. July 24, 2008); Russ-Tobias v. Pa. Bd. of Prob. & Parole, Civil Action No. 04-270, 2006 WL 516771, at *23 (E.D. Pa. Mar. 2, 2006).

As to the second element, "adverse action" in the retaliation context encompasses a larger class of circumstances than the narrower "adverse employment action" concept in a substantive discrimination case. Thompson v. North American Stainless, L.P., 131 S. Ct. 863, 867–68 (2011). In addition to actions that "affect the terms and conditions of employment," Title VII's anti-retaliation provision more broadly proscribes "any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Thompson, 131 S. Ct. at 868 (quoting Burlington N. & Santa Fe Ry.

Co. v. White, 548 U.S. 53, 68 (2006)).  This is equally true for
retaliatory harassment claims, which are predicated on the
presence of a hostile work environment that is shown to be
retaliation for protected activity.  Moore v. City of
Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006).  However,
adverse actions are only those actions "that produce[] an injury
or harm."  Burlington, 548 U.S. at 67.  They are not "petty
slights, minor annoyances, [or] simple lack of good manners."
Id. at 68.

     Finally, there must be evidence of a causal link.  When
there is no direct evidence of a causal connection between
protected activity and adverse action, the causation prong can be
met in two main ways.  First, "[w]here the temporal proximity
between the protected activity and the adverse action is
unusually suggestive, it is sufficient standing alone to create
an inference of causality and defeat summary judgment."  LeBoon
v. Lancaster Jewish Cmty. Ctr., 503 F.3d 217, 232 (3d Cir. 2007)
(quotation marks omitted).  Second, even where no such proximity
exists, we are instructed to determine "whether 'the proffered
evidence, looked at as a whole, may suffice to raise the
inference.'"  LeBoon, 503 F.3d at 232 (quoting Farrell v.
Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)).  This
can include an "intervening pattern of antagonism" between the
protected activity and the adverse action that is "so strong that
it [overcomes] the lack of temporal proximity."  See Farrell, 206
F.3d at 281 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921

(3d Cir. 1997)).  We are cautioned to consider "a broad array of evidence" on the causation prong.  Id. at 232-33.

     With these principles explained, we now analyze Daniels' retaliation claims against the School District under Title VII and the ADEA, against the individual defendants under § 1981, and against all defendants under the PHRA in chronological order by school, ending with her May 2012 termination.  For the reasons provided below, we find that Daniels' retaliation claims all fail to survive summary judgment.

VIII.

     For her age-based retaliation claims as they relate to the 2009-2010 school year at Mifflin, we find that Daniels fails to make out a prima facie case.  She complained to Mason, Mifflin's principal, at some point during or after Parent's Night in September 2009 that Mason's "grandparents" comment was unacceptable.  This stands in isolation as the only complaint, direct or indirect, that Mason is shown in the record to have received from Daniels.

     It would strain the imagination to find that this complaint was made with an objectively reasonable belief by Daniels that Mason's comment was unlawful.  See Moore, 461 F.3d at 341.  Putting aside the deposition testimony in this case that School District faculty frequently levy this sort of statement to garner respect for teachers rather than to express impermissible bias, Mason's words were both indirect and innocuous.  Daniels'

complaint does not satisfy the first prong of Daniels' prima
facie age-related retaliation case at Mifflin.

Even assuming that it does satisfy that prong and that
Daniels went on to face adverse action at Mifflin, Daniels' prima
facie case of age-related retaliation as to her time at Mifflin
fails on the causation prong as well.  Daniels made only one
complaint to Mason during the 2009-2010 school year, and that
occurred on or shortly after Parent's Night on September 9, 2009.
There is simply nothing in the record to permit us to infer a
link between this complaint, whenever it may have happened, and
Daniels' experience at Mifflin during the 2009-2010 school year.
Daniels took issue at times with Mason's evaluations of her
teaching, but Mason eventually rated Daniels as satisfactory at
the end of the school year.  Even if there are genuine disputes
of material fact as to whether Daniels' 2010 forced transfer from
Mifflin was a product of substantive race or age discrimination,
there are no facts to suggest through temporal proximity or
otherwise that anything Mason did constituted age-related
retaliation.  We will grant summary judgment in favor of the
School District on count eight, which is Daniels' age-related
retaliation claim under the ADEA.  We will further grant summary
judgment in favor of the School District and Mason on count six,
which is Daniels' age-related retaliation claim based on the
PHRA, to the extent those claims arise out of Daniels' time at
Mifflin.

Daniels' claims of race-related retaliation based on the 2009-2010 school year at Mifflin fail as well. As noted above, Daniels' complaint about Mason's "grandparents" comment was the only one Daniels made during the 2009-2010 school year. She lodged no complaint of racism at Mifflin, official or unofficial, until October 28, 2010, over four months after she had left the school. Daniels therefore has not met her burden of bringing forward any evidence of race-related protected activities for the purposes of establishing a prima facie retaliation case against the School District and Mason for her time at Mifflin.

Accordingly, summary judgment will be granted in favor of Mason with respect to Daniels' count four in its entirety, which is Daniels' claim of race-related retaliation under § 1981, and with respect to count six in its entirety, which is Daniels' claim of age- and race-related retaliation under the PHRA. Summary judgment will also be granted in favor of the School District on counts three, six and eight of Daniels' complaint for race and age discrimination under Title VII and the ADEA, insofar as those claims arise from the 2009-2010 school year at Mifflin.

IX.

Daniels also has claims of age-based retaliation against the School District under the PHRA and ADEA and against defendants Marianno and Christy under the PHRA as they relate to the 2010-2011 school year at Vare. Here again, Daniels has not met the first prong of her prima facie case. In her September 6,

2010 letter addressed to a School District superintendent,
Daniels complained of Mason's alleged ageism from which she
suffered while at Mifflin, that is, Mason's "grandparents"
comment and a statement from a colleague that "[t]hey call you
Old School."  Daniels supplied a litany of other exceptions to
Mason's conduct in the September 6 letter, none of which was
race- or age-related.  On October 28, 2010 Daniels also initiated
a formal PHRC process concerning Mason's same conduct, adding a
conclusion that Mason's actions also amounted to race
discrimination.  She finally submitted a PHRC complaint on
February 22, 2011, in which she complained of the conduct of
Marianno, the principal at Vare, and the conduct of Christy, the
assistant principal at Vare, as continuations at Vare of the
proscribed conduct she faced at Mifflin.  Specifically, she
asserted that the December 2010 disciplinary memo for absences
that Christy issued, Marianno's request that Daniels teach
classes outside her area of certification, Daniels' lack of a
permanent room assignment or classroom keys, and her assignment
to teach "students with the worse [sic] behavior and the lowest
academic scores" all constituted unlawful retaliation under the
PHRA.

     As we have previously explained, the isolated and
benign age-related comments made during the 2009-2010 school year
at Mifflin cannot objectively serve as the basis for a complaint
of age-based retaliation.  Thus, Daniels' September 6 and
October 28 complaints are not protected activity.  Daniels'

February 2, 2011 or February 22, 2011 complaints cannot be said to have been made in the "objectively reasonable belief, in good faith, that the activity ... [she] oppose[s] is unlawful." Moore, 461 F.3d at 341.

No party has pointed us to an age-related incident during the 2010-2011 school year at Vare, and there is no evidence to suggest that either Marianno or Christy was aware of Daniels' woes at Mifflin. Daniels may have been one of the oldest teachers at Vare, or even the oldest, but this, by itself, does not make reasonable a belief that her superiors' conduct was unlawful under any relevant statute. "A general complaint of unfair treatment does not translate into a charge of illegal age discrimination." Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995). We find that Daniels did not make any of the complaints during her time at Vare in the good faith, objective belief that the treatment of which she complained was illegal. These complaints are therefore not "protected activity" sufficient to meet the first prong of the McDonnell Douglas test.

Even assuming that Daniels has met the "protected activity" prong and that she faced adverse action at Vare, Daniels fails to meet the third prong of the McDonnell Douglas test by bringing forward evidence of a causal link between her protected activity and any adverse actions at Vare. We note that her October 2010 PHRC complaint happened contemporaneously with the first of her student disciplinary referrals and that her February 22, 2011 PHRC complaint was followed by an

unsatisfactory evaluation just a handful of days later.  The gap
in time between the protected activity and adverse actions on
these facts is very short.  However, we must remember that we are
to consider temporal proximity dispositive of the causation prong
only when it is unusually suggestive.  LeBoon, 503 F.3d at 232.
We cannot so find in this case.

The October 28, 2010 PHRC complaint took issue with
Mason's conduct at Mifflin in the previous school year only.
This complaint not only does not concern Vare, but Daniels has
also failed to point to any evidence to suggest that Marianno or
Christy had any knowledge that the complaint had been lodged.[11]
"It is only intuitive that for protected conduct to be a
substantial or motiving factor in a decision, the decisionmakers
must be aware of the protected conduct."  Ambrose v. Twp. of
Robinson, Pa., 303 F.3d 488, 493 (3d Cir. 2002).  And while it is
true that Daniels filed a PHRC complaint against Marianno and
Christy in February 2011, that complaint cannot be said to have
precipitated any adverse action for two reasons.  First, the
negative performance evaluations and failures to handle student
misconduct that Daniels asserts are adverse actions she faced at
Vare both pre- and post-dated Daniels' protected activity,
undercutting any inference of causation.  Second, here again,

_____

11.  Rather, the Vare supervisors were only shown to have had
knowledge of Daniels' February 2, 2011 email sent directly to
Marianno.  That email, which complained of "harassment" but did
not make any mention of race or age, cannot be considered
protected activity.

-37-

there is no evidence that Marianno or Christy knew at that time that the PHRC complaints existed.[12] There is simply nothing in the record that any of the adverse actions Daniels faced during the 2010-2011 school year at Vare were causally related to her protected activity.

Accordingly, summary judgment will be granted in favor of the School District on counts six and eight, which are Daniels' age retaliation claims under the PHRA and ADEA respectively, as they relate to the 2010-2011 school year at Vare. We will also grant summary judgment on count six in favor of Marianno and Christy as it relates to age retaliation at Vare.

The same analysis applies to Daniels' race-related retaliation claims under § 1981, Title VII, and the PHRA for the 2010-2011 school year at Vare. On the first, the protected activity prong, only Daniels' October 28, 2010 and February 22, 2011 formal PHRC complaints mention race, and the February 22 complaint only does so in the form of a conclusory accusation. Indeed, the only race-related fact in either of these complaints is that Mifflin is under federal investigation for not hiring minority teachers, an investigation irrelevant to Daniels' case. These complaints do not satisfy the first prong of a prima facie case of race-related discrimination under Title VII and the PHRA

---

12. While there is an answer in the record from the School District's assistant general counsel to Daniels' October 28, 2010 PHRC complaint concerning the 2009-2010 school year Mifflin, we have not been provided evidence of an answer to Daniels' other PHRC complaints.

because they were not made with an objectively reasonable belief that the conduct complained of was unlawful.

The rest of the analysis set forth above on Daniels' age-related retaliation claims at Vare applies with equal force to her race-related retaliation claims. Even assuming that Daniels has shown protected activity and adverse action, there is nothing shown in the record from which a reasonable inference can be made to support a causal link between the two. We will therefore grant summary judgment on count three, which is Daniels' race-based retaliation claim under Title VII, in favor of the School District insofar as it is based on the 2010-2011 school year at Vare. In addition, to the extent count six, which is Daniels' retaliation claim brought under the PHRA, concerns race retaliation at Vare, we will grant summary judgment on it in favor of the School District, Marianno, and Christy. Finally, we will grant summary judgment in favor of Marianno and Christy on count four in its entirety, which is Daniels' claim of race retaliation under § 1981.

X.

We turn to the 2011-2012 year at Penrose. Because the operative facts are identical, we will consider Daniels' age- and race-related retaliation claims from this time period together. On December 13, 2011, Daniels supplemented her previous, February 22, 2011 PHRC complaint to include complaints of continued ageism and racism at Penrose by Pendino, the principal at that school. Since that complaint alleges that Daniels was

moved to the sixth grade from the Middle Years and replaced by a younger, Caucasian teacher at Penrose, we find that this complaint meets the first prong of her prima facie claims of age- and race-related retaliation at Penrose. Moore, 461 F.3d at 341.

Daniels has met the second prong of her prima facie case because she has put forth evidence that she faced adverse actions in the receipt of near-weekly disciplinary memoranda beginning September 14, 2011 and continuing through December 15, 2011. This discipline ultimately culminated in a recommendation from Pendino that Daniels be terminated. Daniels has thus satisfied the first two prongs of the prima facie case of age- and race-related retaliation case from her time at Penrose.

The third prong requires evidence of causation. Pendino's discipline of Daniels started in mid-September 2011 and became more severe through the fall rather than being precipitated by Daniels' PHRC complaint as supplemented on December 13, 2011. Daniels submitted her PHRC supplement between the December 7, 2011 conference that led to Pendino's termination recommendation and the December 15 recommendation itself. This temporal proximity could perhaps be considered unusually suggestive if it is viewed in isolation. See LeBoon, 503 F.3d at 232. However, there is no support in the record that Pendino had any knowledge of this PHRC filing. Without such knowledge there can be no retaliation. Ambrose, 303 F.3d at 493. Accordingly, Daniels has not met her burden of meeting the third prong of her prima facie case of retaliation at Penrose.

-40-

Even assuming, however, that Daniels has met her prima facie burden, the School District and Pendino have brought forward evidence of legitimate, non-discriminatory reasons for their actions. Each disciplinary action that Pendino issued in the fall of 2011 was accompanied by reasons for why it was issued. As at Mifflin and Vare, Daniels faced discipline at Penrose for, among other things, failing to submit lesson plans and failing to control her students in and out of the classroom.[13] These are legitimate, non-discriminatory reasons to discipline a teacher.

Daniels has not pointed to any evidence to rebut these reasons. Indeed, she is silent on this point. Our own review of the record reveals that Daniels had disagreements with Pendino as to some of the factual predicates for the discipline she administered, but even so, "a wrong decision by an employer does not amount to a discriminatory decision." Pridgen v. Green Valley SNF LLC, 756 F. Supp. 2d 614, 621 (D. Del. 2010) (emphasis added) (citing Fuentes, 32 F.3d at 765). As our Court of Appeals has explained, it is insufficient for Daniels to "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765.

_____

13. Unlike at Vare, there is little to no evidence to suggest that Pendino left Daniels to fend for herself against unruly students.

Furthermore, at the time of the discipline in the fall of 2011, Daniels failed on several occasions to attend investigatory conferences.  She was entitled to assistance from the PFT at these meetings.  Instead, Daniels allowed the disciplinary process to move forward without her input.  Under these facts a factfinder could not reasonably reject the School District's and Pendino's proffered reasons for their actions, and there are no facts beyond Daniels' December 2011 complaint itself that could otherwise lead to an inference of race- or age-based antagonism at Penrose.

We will grant summary judgment in favor of Pendino on count four, which is Daniels' race retaliation claim under § 1981, and count six, which is made up of Daniels' age- and race-related retaliation claims under the PHRA, in their entirety.  We will further grant summary judgment in favor of the School District with respect to Daniels' age- and race-related retaliation claims under Title VII in count three, the PHRA in count six, and the ADEA in count eight, insofar as they are based on the 2011-2012 school year at Penrose.

XI.

We still have before us the issue of Daniels' May 2012 termination.  We will again consider Daniels' age-related retaliation claims together with her race-related retaliation claims.  We note initially that Daniels' claims based on the termination can only be considered as against the School District.  While Pendino, the principal at Penrose, recommended

termination in December 2011, none of the individual defendants in this case had the power to terminate Daniels' employment. Therefore, none of the individual defendants may be liable for Daniels' termination.

With that established, we find that Daniels has met her burden of moving forward on the first two prongs of her prima facie case. She engaged in protected activity as late as December 13, 2011 in the form of a supplemented PHRC complaint complaining of ageism and racism, and the initiation of termination proceedings in May 2012 is a quintessentially adverse action.

We have some doubts that Daniels has brought forward evidence of a causal connection between her protected activities and her termination. There is a large, five-month gap between her last complaint and the initiation of termination proceedings. There was a disagreement through early 2012 concerning Daniels' reasons for taking sick leave, but asserting a right to sick leave is not of itself protected activity under any statute involved in this action. While there are no direct facts that Daniels' PHRC complaint led in any way to her termination, we may also look to an "intervening pattern of antagonism" to infer a causal link when there is no unusually suggestive temporal proximity, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000). Furthermore, a factfinder could make a reasonable inference that Kenney, the School District administrator who made the ultimate recommendation that Daniels

be terminated, had knowledge of Daniels' PHRC complaints.  Kenney
described Daniels' dissatisfaction with her principals in her
letter to Dr. Weiss, and Dr. Weiss' opinion upon which Kenney
based her termination recommendation specifically made mention of
Daniels' pending legal actions against the School District.  We
will therefore find that Daniels has put forward evidence
sufficient to meet her prima facie burden.

The burden therefore shifts to the School District to
put forward legitimate, non-discriminatory reasons for Daniels'
termination.  The School District has established that it
commenced termination proceedings against Daniels because she
failed to return to work when ordered.  Daniels was entitled
under the CBA to demand a binding third-party evaluation of her
medical condition.  She did so.  That physician found that
Daniels should return to work.  Regardless of what Daniels' own
treating physician might have believed about Daniels' condition,
this is a legitimate, non-discriminatory reason for the School
District's actions.

The burden therefore shifts once again back to Daniels
to rebut the School District's stated reasons.  She has failed to
do so.  It is undisputed that Dr. Weiss' opinion was binding
under the CBA, and his word on the issue of Daniels' ability to
work was therefore final.  Daniels contends that Dr. Weiss was
somehow improperly biased, but there is no reasonable inference
that can be made from the record to support this position.  Even
if Kenney had knowledge of Daniels' complaints, her letter to Dr.

Weiss on behalf of the School District followed nearly three months after Daniels' last complaint. The letter and Dr. Weiss' opinion that followed contain no language from which a factfinder could reasonably infer an impermissible influence, and it is undisputed that the PFT took none of the actions within its power to remove Dr. Weiss from the pool of third-party physicians.

For the reasons explained above, Daniels has presented no evidence that could lead a reasonable factfinder either to disbelieve that this medical opinion, paired with Daniels' subsequent failure to return to work, were the reasons for her termination or to believe that an invidious discriminatory reason played a part in the decision. Fuentes, 32 F.3d at 764. Summary judgment will therefore be granted on Daniels' age- and race-related retaliation claims, counts three, six, and eight in her complaint, in favor of the School District for Daniels' May 2012 termination.

XII.

We conclude our analysis with a brief note concerning hostile work environment. The defendants argue in support of their motion for summary judgment that Daniels has failed to meet her burden of putting forward evidence of a prima facie substantive hostile work environment case. While Daniels references "hostile work environment" tangentially in her response, she makes no specific effort to defend a stand-alone hostile work environment claim from summary judgment. We agree

-45-

with defendants that she has failed to come forward with evidence of an illegal hostile work environment.

Summary judgment on Daniels' substantive claim for hostile work environment will be granted in favor of all defendants to the extent such a claim exists. We also note that her complaint makes no mention of such a claim. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

XIII.

In sum, we will grant summary judgment as follows. We will grant summary judgment in favor of all defendants on count nine of Daniels' complaint, which constitutes her claims under § 1983, the First Amendment, and the Fourteenth Amendment. We will additionally grant summary judgment in favor of the School District on Daniels' race discrimination and retaliation claims under § 1981 in their entirety, counts two and four. We will further grant summary judgment in favor of the School District on counts three and eight in their entirety, which are Daniels' claims of race-based retaliation under Title VII and age-based retaliation under the ADEA. Summary judgment will be granted in favor of defendants Marianno, Christy, and Pendino on count five in its entirety, which is Daniels' race and age discrimination claim under the PHRA. We will grant summary judgment in favor of the individual defendants on count four in its entirety, which constitutes Daniels' race retaliation claim under § 1981. As to count six, which is Daniels' age- and race-related retaliation

claim brought under the PHRA against all defendants, we will grant summary judgment in favor of all defendants on the entire claim.  To the extent they exist, summary judgment will be granted in favor of all defendants on any claims of hostile work environment.

We will deny summary judgment with respect to counts one and seven against the School District, which are Daniels' claims of race discrimination under Title VII and age discrimination under the ADEA, for Daniels' 2010 forced transfer from Mifflin to Vare, her replacement by Meiers, and her inability to fully participate in the 2010 site selection process.  We will further deny summary judgment on counts two and five against Mason and the School District concerning Daniels' inability to participate in the 2010 site selection only.